## UNITED STATES *v.* GOUVEIA ET AL.

No. 83–128.   Argued March 20, 1984—Decided May 29, 1984

*Deputy Solicitor General Frey* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Trott, Carolyn F. Corwin,* and *John F. De Pue.*

*Charles P. Diamond,* by appointment of the Court, 464 U. S. 1035, argued the cause for respondents Mills et al. With him on the brief were *M. Randall Oppenheimer* and *Edwin S. Saul. Joel Levine,* by appointment of the Court,

464 U. S. 1035, argued the cause for respondents Gouveia et al. and filed a brief for respondent Segura. *Joseph F. Walsh,* by appointment of the Court, 464 U. S. 1035, filed a brief for respondent Ramirez. *Michael J. Treman,* by appointment of the Court, 464 U. S. 1035, filed a brief for respondent Gouveia. *Manuel U. A. Araujo* filed a brief for respondent Reynoso.*

JUSTICE REHNQUIST delivered the opinion of the Court.

Respondents William Gouveia, Robert Ramirez, Adolpho Reynoso, and Philip Segura were convicted of murdering a fellow inmate at a federal prison in Lompoc, Cal. Respondents Robert Mills and Richard Pierce were convicted of a later murder of another inmate at the same institution. Prison officials placed each respondent in administrative detention shortly after the murders, and they remained there for an extended period of time before they were eventually indicted on criminal charges. On appeal of respondents' convictions, the en banc Court of Appeals for the Ninth Circuit held by divided vote that they had a Sixth Amendment right to an attorney during the period in which they were held in administrative detention before the return of indictments against them, and that because they had been denied that right, their convictions had to be overturned and their indictments dismissed. 704 F. 2d 1116 (1983). We granted certiorari to review the Court of Appeals' novel application of our Sixth Amendment precedents, 464 U. S. 913 (1983), and we now reverse.

On November 11, 1978, Thomas Trejo, an inmate at the Federal Correctional Institution in Lompoc, Cal., was found dead from 45 stab wounds in the chest. Prison officials and agents from the Federal Bureau of Investigation began inde-

---

*Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union Foundation by *Richard F. Ziegler* and *Charles S. Sims;* and for the National Legal Aid and Defender Association by *Richard J. Wilson.*

pendent investigations of the murder. Prison officials immediately suspected respondents Reynoso and Gouveia and placed them in the Administrative Detention Unit (ADU) at Lompoc. They were released back into the general prison population on November 22, 1978, but after officials obtained further information about the murder, on December 4, 1978, they returned Reynoso and Gouveia to the ADU, and placed respondents Segura and Ramirez in the ADU as well. Later in December, prison officials held disciplinary hearings, determined that all four respondents had participated in the murder of inmate Trejo, and ordered their continued confinement in the ADU. While in the ADU, respondents were separated from the general prison population and confined to individual cells. Although their participation in various prison programs was curtailed, they were still allowed regular visitation rights, exercise periods, access to legal materials, and unmonitored phone calls. 704 F. 2d, at 1118; see generally 28 CFR §§ 541.19, 541.20(d) (1983). Respondents remained in the ADU without appointed counsel for approximately 19 months. On June 17, 1980, a federal grand jury returned an indictment against respondents on charges of first-degree murder and conspiracy to commit murder in violation of 18 U. S. C. §§ 1111 and 1117 respectively. On July 14, 1980, respondents were arraigned in federal court, at which time a Federal Magistrate appointed counsel for them.

Before trial respondents filed a motion to dismiss their indictments, arguing that the delay of approximately 19 months between the commission of the crime and the return of the indictments violated their due process rights under the Fifth Amendment or, alternatively, their Sixth Amendment right to a speedy trial, and that their confinement in the ADU without appointment of counsel during that period violated their Sixth Amendment right to counsel. The District Court for the Central District of California denied their motion, and respondents proceeded to trial. Their first trial, which lasted approximately four weeks, ended in a mistrial. On retrial, respondents were convicted on both counts and

were sentenced to consecutive life and 99-year terms of imprisonment.

The scenario is much the same in the case of Mills and Pierce. Inmate Thomas Hall was stabbed to death at Lompoc on August 22, 1979. Immediately afterwards Mills and Pierce were examined by a prison doctor and questioned by FBI agents regarding the murder. Prison officials suspected them of involvement in the murder and placed them in the ADU pending further investigation. On September 13, 1979, prison officials conducted a disciplinary hearing, concluded that respondents had murdered inmate Hall, and ordered their continued confinement in the ADU where they remained for the next eight months. On March 27, 1980, a federal grand jury returned an indictment against Mills and Pierce on charges of first-degree murder in violation of 18 U. S. C. § 1111 and of conveyance of a weapon in prison in violation of 18 U. S. C. § 1792, and against Pierce on a charge of assault in violation of 18 U. S. C. § 113(c). At the time of their arraignment on April 21, 1980, Mills and Pierce were appointed counsel and were released from the ADU.

Before trial Mills and Pierce also filed a motion to dismiss their indictments, alleging that the 8-month preindictment delay violated their Fifth Amendment due process rights and their Sixth Amendment speedy trial right, and that their confinement without counsel for that period violated their Sixth Amendment right to counsel. The District Court for the Central District of California granted the motion to dismiss. A panel of the Court of Appeals for the Ninth Circuit reversed and remanded for trial, holding that respondents' Sixth Amendment rights were not triggered during their administrative segregation because they had not yet been arrested and accused, and that respondents had made an insufficient showing of actual prejudice from the preindictment delay so as to justify dismissal of the indictments on due process grounds. *United States* v. *Mills*, 641 F. 2d 785, cert. denied, 454 U. S. 902 (1981). Respondents Mills and

Pierce were then convicted on all counts and sentenced to life imprisonment.

The Court of Appeals, proceeding en banc, consolidated the appeals of all six respondents and addressed only the issue of whether the Sixth Amendment requires the appointment of counsel before indictment for indigent inmates confined in administrative detention while being investigated for criminal activities. 704 F. 2d, at 1119.[1] The Court of Appeals majority recognized that a plurality of this Court had concluded in *Kirby* v. *Illinois*, 406 U. S. 682 (1972), that the Sixth Amendment right to counsel attaches only when formal judicial proceedings are initiated against an individual by way of indictment, information, arraignment, or preliminary hearing. The majority recognized that no such proceedings had been initiated against respondents during the period of time for which they asserted a right to appointed counsel in this case.

The majority went on to note, however, that *Kirby* is not a prison case and that the point at which the Sixth Amendment right to counsel is triggered is different in the prosecution of prison crimes. 704 F. 2d, at 1120. In so holding the majority analogized to Sixth Amendment speedy trial cases, where this Court has held that the Sixth Amendment speedy trial right is triggered when an individual is arrested and held to

---

[1] The narrow issue before the Court of Appeals and before us today is whether the Sixth Amendment requires the appointment of counsel for indigent inmates in respondents' situation. Respondents have not contended that they were denied the opportunity to retain their own private counsel while they were in administrative segregation. 704 F. 2d, at 1119. As the Court of Appeals noted, respondents had visitation privileges and the opportunity to make unmonitored phone calls to attorneys while in the ADU. *Ibid.* See 28 CFR §§ 541.19(c)(10), 541.20(d) (1983). Respondents also have not asserted a Sixth Amendment ineffective-assistance-of-counsel claim nor have they questioned our holding in *Wolff* v. *McDonnell*, 418 U. S. 539, 570 (1974), that inmates have no right to retained or appointed counsel at prison disciplinary proceedings. See *Baxter* v. *Palmigiano*, 425 U. S. 308, 315 (1976).

answer criminal charges.   See *United States* v. *Marion,* 404 U. S. 307, 320 (1971).   The en banc majority reasoned that just as such an arrest constitutes an "accusation" for Sixth Amendment speedy trial purposes, the administrative detention of an inmate for more than 90 days because of a pending felony investigation constitutes an "accusation" for Sixth Amendment right to counsel purposes.[2]   Thus, according to the Court of Appeals' holding, an indigent inmate isolated in administrative detention while the subject of a felony investigation must be afforded counsel after 90 days, or else be released back into the prison population, in order to ensure that he or his lawyer will be able to take preindictment investigatory steps to preserve his defense at trial.   704 F. 2d, at 1124.

Applying its test to the facts of this case, the Court of Appeals majority held that each respondent had been denied his Sixth Amendment right to counsel.   It concluded that the record showed that each respondent had been held in administrative detention longer than 90 days, that each had been held at least in part because of a pending felony investigation,[3] and that each had requested and had been denied counsel during his confinement in the ADU.   The majority went on to conclude that the appropriate remedy for redressing

---

[2] The majority arrived at the 90-day figure based on its own interpretation of the current federal prison regulations as allowing detention for up to 90 days for disciplinary reasons.   See 28 CFR § 541.20(c) (1983).

[3] Relying on his interpretation of current prison regulations, the Solicitor General vehemently argues that, whatever additional reasons legitimately may have contributed to the decision to confine respondents in the ADU, the primary reason for their confinement was to ensure the security of the institution.   Thus he argues that that security-related detention cannot be equated with an arrest or accusation for Sixth Amendment purposes. Brief for United States 23–27; Tr. of Oral Arg. 9–12.   But our holding today makes the reason for the detention irrelevant for purposes of the only issue before us, the point at which the Sixth Amendment right to counsel is triggered.   Respondents have not challenged "the legitimacy of administrative detention in general or its appropriateness" in their particular cases.   704 F. 2d, at 1121.

the Sixth Amendment violations in this case was reversal of respondents' convictions and dismissal of the indictments against them.[4]

Five judges dissented from the en banc majority's Sixth Amendment holding. Relying on *Kirby* v. *Illinois, supra,* the dissent concluded that the Sixth Amendment right to counsel is triggered by the initiation of formal criminal proceedings even in the prison context, and that the majority's conclusion to the contrary shows a misunderstanding of the purpose of the counsel guarantee. 704 F. 2d, at 1127–1129. We agree with the dissenting judges' application of our precedents to this situation, and, accordingly, we reverse the en banc majority's holding that respondents had a Sixth Amendment right to the appointment of counsel during their preindictment segregation.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." As the Court of Appeals majority noted, our cases have long recognized that the right to counsel attaches only at or after the initiation of adversary judicial proceedings against the defendant. In *Kirby* v. *Illinois, supra,* a plurality of the Court summarized our prior cases as follows:

> "In a line of constitutional cases in this Court stemming back to the Court's landmark opinion in *Powell* v. *Alabama,* 287 U. S. 45, it has been firmly established that a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him. See *Powell* v. *Alabama, supra; Johnson* v. *Zerbst,*

---

[4] The Solicitor General argues here that dismissal of the indictments is an inappropriate remedy absent a showing of actual and specific prejudice to respondents and that they have not made that showing in this case. Brief for United States 44–60. Given our holding on the substantive Sixth Amendment issue, however, we have no occasion to address the remedy question.

304 U. S. 458; *Hamilton* v. *Alabama*, 368 U. S. 52; *Gideon* v. *Wainwright*, 372 U. S. 335; *White* v. *Maryland*, 373 U. S. 59; *Massiah* v. *United States*, 377 U. S. 201; *United States* v. *Wade*, 388 U. S. 218; *Gilbert* v. *California*, 388 U. S. 263; *Coleman* v. *Alabama*, 399 U. S. 1.

". . . [W]hile members of the Court have differed as to the existence of the right to counsel in the contexts of some of the above cases, *all* of those cases have involved points of time at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.*, at 688–689 (emphasis in original).

The view that the right to counsel does not attach until the initiation of adversary judicial proceedings has been confirmed by this Court in cases subsequent to *Kirby.* See *Estelle* v. *Smith*, 451 U. S. 454, 469–470 (1981); *Moore* v. *Illinois*, 434 U. S. 220, 226–227 (1977); *Brewer* v. *Williams*, 430 U. S. 387, 398–399 (1977); *United States* v. *Mandujano*, 425 U. S. 564, 581 (1976) (opinion of BURGER, C. J.).[5]

That interpretation of the Sixth Amendment right to counsel is consistent not only with the literal language of the Amendment, which requires the existence of both a "criminal prosecutio[n]" and an "accused," but also with the purposes which we have recognized that the right to counsel serves. We have recognized that the "core purpose" of the counsel guarantee is to assure aid at trial, "when the accused [is] con-

---

[5] The only arguable deviations from that consistent line of cases are *Miranda* v. *Arizona*, 384 U. S. 436 (1966), and *Escobedo* v. *Illinois*, 378 U. S. 478 (1964). Although there may be some language to the contrary in *United States* v. *Wade*, 388 U. S. 218 (1967), we have made clear that we required counsel in *Miranda* and *Escobedo* in order to protect the Fifth Amendment privilege against self-incrimination rather than to vindicate the Sixth Amendment right to counsel. See *Rhode Island* v. *Innis*, 446 U. S. 291, 300, n. 4 (1980); *Kirby* v. *Illinois*, 406 U. S., at 689; *Johnson* v. *New Jersey*, 384 U. S. 719, 729–730 (1966).

fronted with both the intricacies of the law and the advocacy of the public prosecutor." *United States* v. *Ash*, 413 U. S. 300, 309 (1973). Indeed the right to counsel

> "embodies a realistic recognition of the obvious truth that the average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty, wherein the prosecution is presented by experienced and learned counsel." *Johnson* v. *Zerbst*, 304 U. S. 458, 462–463 (1938).

Although we have extended an accused's right to counsel to certain "critical" pretrial proceedings, *United States* v. *Wade*, 388 U. S. 218 (1967), we have done so recognizing that at those proceedings, "the accused [is] confronted, just as at trial, by the procedural system, or by his expert adversary, or by both," *United States* v. *Ash, supra*, at 310, in a situation where the results of the confrontation "might well settle the accused's fate and reduce the trial itself to a mere formality." *United States* v. *Wade, supra*, at 224.

Thus, given the plain language of the Amendment and its purpose of protecting the unaided layman at critical confrontations with his adversary, our conclusion that the right to counsel attaches at the initiation of adversary judicial criminal proceedings "is far from a mere formalism." *Kirby* v. *Illinois*, 406 U. S., at 689. It is only at that time "that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." *Ibid.*

The Court of Appeals departed from our consistent interpretation of the Sixth Amendment in these cases, and in so doing, fundamentally misconceived the nature of the right to counsel guarantee. We agree with the dissent that the ma-

jority's analogy to Sixth Amendment speedy trial cases is inapt. Our speedy trial cases hold that that Sixth Amendment right may attach before an indictment and as early as the time of "arrest and holding to answer a criminal charge," *United States* v. *MacDonald*, 456 U. S. 1, 6–7 (1982); *United States* v. *Lovasco*, 431 U. S. 783, 788–789 (1977); *Dillingham* v. *United States*, 423 U. S. 64 (1975) *(per curiam); United States* v. *Marion*, 404 U. S., at 320, but we have never held that the right to counsel attaches at the time of arrest. This difference is readily explainable, given the fact that the speedy trial right and the right to counsel protect different interests. While the right to counsel exists to protect the accused during trial-type confrontations with the prosecutor, the speedy trial right exists primarily to protect an individual's liberty interest, "to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges." *United States* v. *MacDonald, supra,* at 8. See *Barker* v. *Wingo*, 407 U. S. 514, 532–533 (1972); *United States* v. *Marion, supra,* at 320. Thus, the majority's attempt to draw an analogy between an arrest and an inmate's administrative detention pending investigation may have some relevance in analyzing when the speedy trial right attaches in this context, but it is not relevant to a proper determination of when the right to counsel attaches.[6]

---

[6] Of course we express no view as to when the Sixth Amendment speedy trial right attaches in this context because that issue is not before us. The Court of Appeals for the Ninth Circuit, like several other Circuits, see, *e. g., United States* v. *Daniels*, 698 F. 2d 221, 223 (CA4 1983); *United States* v. *Blevins*, 593 F. 2d 646, 647 (CA5 1979) *(per curiam),* however, has held that the segregation of an inmate from the general population pending criminal charges does not constitute an "arrest" for purposes of the speedy trial right. *United States* v. *Clardy*, 540 F. 2d 439, 441, cert. denied, 429 U. S. 963 (1976). Given its own *Clardy* holding, the Court of Appeals' analogy here seems somewhat strained.

The Court of Appeals' holding also confuses the purpose of the right to counsel with purposes that are served by the Fifth Amendment due process guarantee and the statutes of limitations applicable to the particular crime being investigated. The majority concludes that the extension of the right to counsel to this prison context is necessary to protect against the possibility that the Government may delay the initiation of formal charges, thus delaying the appointment of counsel, while it develops its case against the isolated and unaided inmate. 704 F. 2d, at 1122. By the time the Government decides to bring charges, the majority felt, witnesses' memories could have dimmed, alibi witnesses could have been transferred to other facilities, and physical evidence could have deteriorated. *Id.*, at 1126.

Those concerns, while certainly legitimate ones, are simply not concerns implicating the right to counsel, and we reaffirm that the mere "possibility of prejudice [to a defendant resulting from the passage of time] . . . is not itself sufficient reason to wrench the Sixth Amendment from its proper context." *United States* v. *Marion, supra,* at 321–322. In holding that the appointment of counsel or the release of the inmate from segregation could remedy its concerns, the Court of Appeals must have concluded, quite illogically we believe, that the presence of the inmate in the general prison population or the appointment of a lawyer could somehow prevent the deterioration of physical evidence, or that the inmate or his counsel could begin an effective investigation of the crime within the restricted prison walls before even being able to discover the nature of the Government's case. Of course, both inside and outside the prison, it may well be true that in some cases preindictment investigation could help a defendant prepare a better defense. But, as we have noted, our cases have never suggested that the purpose of the right to counsel is to provide a defendant with a preindictment private investigator, and we see no reason to adopt that novel interpretation of the right to counsel in this case.

Thus, at bottom, the majority's concern is that because an inmate suspected of a crime is already in prison, the prosecution may have little incentive promptly to bring formal charges against him, and that the resulting preindictment delay may be particularly prejudicial to the inmate, given the problems inherent in investigating prison crimes, such as the transient nature of the prison population and the general reluctance of inmates to cooperate. But applicable statutes of limitations protect against the prosecution's bringing stale criminal charges against any defendant, *United States* v. *Lovasco, supra,* at 788–789; *United States* v. *Marion, supra,* at 322, and, beyond that protection, the Fifth Amendment requires the dismissal of an indictment, even if it is brought within the statute of limitations, if the defendant can prove that the Government's delay in bringing the indictment was a deliberate device to gain an advantage over him and that it caused him actual prejudice in presenting his defense. *United States* v. *Lovasco, supra,* at 789–790; *United States* v. *Marion, supra,* at 324.[7] Those protections apply to criminal defendants within and without the prison walls, and we decline to depart from our traditional interpretation of the Sixth Amendment right to counsel in order to provide additional protections for respondents here.

We conclude that the Court of Appeals was wrong in holding that respondents were constitutionally entitled to the appointment of counsel while they were in administrative segregation and before any adversary judicial proceedings had been initiated against them. Accordingly, we reverse

---

[7] We have of course rejected the arguments that prosecutors are constitutionally obligated to file charges against a suspect as soon as they have probable cause but before they believe that they can establish guilt beyond a reasonable doubt, *United States* v. *Lovasco,* 431 U. S., at 791, and that prosecutors must file charges as soon as they marshal enough evidence to prove guilt beyond a reasonable doubt but before their investigations are complete. *Id.,* at 792–795.

the judgment of the Court of Appeals and remand for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE BRENNAN joins, concurring in the judgment.

"Whatever else it may mean, the right to counsel granted by the Sixth and Fourteenth Amendments means *at least* that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him—'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Brewer* v. *Williams*, 430 U. S. 387, 398 (1977) (emphasis supplied) (quoting *Kirby* v. *Illinois*, 406 U. S. 682, 689 (1972) (plurality opinion)). That statement, which does not foreclose the possibility that the right to counsel might under some circumstances attach prior to the formal initiation of judicial proceedings, has been the rule this Court has consistently followed. Today the Court seems to adopt a broader rule, stating that "the right to counsel attaches *only* at or after the initiation of adversary judicial proceedings against the defendant." *Ante*, at 187 (emphasis supplied). Because I believe this statement is unjustified by our prior cases and unnecessary to decide this case, I cannot join the opinion of the Court.

In *Escobedo* v. *Illinois*, 378 U. S. 478 (1964), this Court squarely held that the Sixth Amendment's right to counsel can attach before formal charges have been filed. Escobedo had been denied access to his lawyer while he was in custody but before any formal charges had been filed. The Court explained:

> "The interrogation here was conducted before petitioner was formally indicted. But in the context of this case, that fact should make no difference. When petitioner requested, and was denied, an opportunity to consult with his lawyer, the investigation had ceased to be a

general investigation of 'an unsolved crime.' Petitioner had become the accused, and the purpose of the interrogation was to 'get him' to confess his guilt despite his constitutional right not to do so." *Id.*, at 485 (citation omitted) (quoting *Spano* v. *New York*, 360 U. S. 315, 327 (1959) (Stewart, J., concurring)).

The Court added: "It would exalt form over substance to make the right to counsel, under the circumstances, depend on whether at the time of the interrogation, the authorities had secured a formal indictment. Petitioner had, for all practical purposes, already been charged with murder." 378 U. S., at 486.[1]

The Court's dictum concerning the right to counsel is likewise inconsistent with *Miranda* v. *Arizona*, 384 U. S. 436 (1966). There, the Court held that during custodial interrogation the suspect has a right to have counsel present, and that if he cannot afford counsel he is entitled to have counsel appointed to represent him free of charge. See *id.*, at 469–473. The Court recognized that custodial interrogation was the true beginning of adversarial proceedings: "It is at this point that our adversary system of criminal proceedings commences, distinguishing itself at the outset from the inquisitorial system recognized in some countries." *Id.*, at 477. See also *Coleman* v. *Alabama*, 399 U. S. 1, 20 (1970) (Harlan, J., concurring in part and dissenting in part); *Dickey* v. *Florida*, 398 U. S. 30, 44 (1970) (BRENNAN, J., concurring); *United States* v. *Oliver*, 505 F. 2d 301, 305, n. 12 (CA7 1974).[2]

---

[1] See also 378 U. S., at 487, n. 6 ("The English Judges' Rules also recognize that a functional rather than a formal test must be applied and that, under circumstances such as those here, no special significance should be attached to formal indictment"). Indeed, the rule the majority seems to embrace is similar to the rule advocated in dissent in *Escobedo*. See *id.*, at 493–494 (Stewart, J., dissenting).

[2] To say, as did the Court in *Johnson* v. *New Jersey*, 384 U. S. 719 (1966), that the "prime purpose" of *Escobedo* and *Miranda* was "to guarantee full effectuation of the privilege against self-incrimination," 384 U. S.,

*United States* v. *Wade*, 388 U. S. 218 (1967), illustrates how Sixth Amendment jurisprudence has turned not on the formal initiation of judicial proceedings but rather on the nature of the confrontation between the authorities and the citizen. The Court began its Sixth Amendment analysis concerning the right to counsel at lineup identifications by noting that "in addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." *Id.*, at 226. The Court then reviewed its prior cases and concluded:

> "[W]e scrutinize *any* pretrial confrontation of the accused to determine whether the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself." *Id.*, at 227 (emphasis in original).

---

at 729, is merely to state a central rationale for attachment of the right to counsel prior to the formal commencement of the adversary process; it in no way contradicts the proposition that the Sixth Amendment can apply prior to the initiation of judicial proceedings. *Escobedo* elaborates:

"It is argued that if the right to counsel is afforded prior to indictment, the number of confessions obtained by the police will diminish significantly, because most confessions are obtained during the period between arrest and indictment, and 'any lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances.' This argument, of course, cuts two ways. The fact that many confessions are obtained during this period points up its critical nature as a 'stage when legal aid and advice' are surely needed. The right to counsel would indeed be hollow if it began at a period when few confessions were obtained. There is necessarily a direct relationship between the importance of a stage to the police in their quest for a confession and the criticalness of that stage to the accused in his need for legal advice. Our Constitution, unlike some others, strikes the balance in favor the right of the accused to be advised by his lawyer of his privilege against self-incrimination." 378 U. S., at 488 (footnotes and citations omitted).

The Court has adhered to this formulation in subsequent cases. See *United States* v. *Henry*, 447 U. S. 264, 269 (1980); *Gerstein* v. *Pugh*, 420 U. S. 103, 122–123 (1975); *Schneckloth* v. *Bustamonte*, 412 U. S. 218, 238–240 (1973); *Coleman* v. *Alabama*, 399 U. S., at 9 (plurality opinion). Perhaps most telling is *United States* v. *Ash*, 413 U. S. 300 (1973), dealing with the right to counsel at a pretrial photographic identification of the accused as the perpetrator by a Government witness. While Justice Stewart argued that "this constitutional 'right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated,'" *id.*, at 322 (opinion concurring in judgment) (quoting *Kirby* v. *Illinois*, 406 U. S., at 688 (plurality opinion)), that was not the path the Court took. It acknowledged that "extension of the right to counsel to events before trial has resulted from changing patterns of criminal procedure and investigation that have tended to generate pretrial events that might appropriately be considered part of the trial itself," 413 U. S., at 310. It concluded that "the test utilized by the Court has called for examination of the event in order to determine whether the accused required aid in coping with legal problems or assistance in meeting his adversary." *Id.*, at 313.[3]

---

[3] Contrary to the majority's intimations, the cases it cites *ante*, at 187–188, do not indicate that a majority of the Court has embraced the broad rule suggested by the majority's dictum. The statement in *Kirby* v. *Illinois*, 406 U. S. 682 (1972), that the right to counsel "attaches only at or after the time that adversary judicial proceedings have been initiated," *id.*, at 688 (plurality opinion), was not joined by a majority. Similarly, THE CHIEF JUSTICE's opinion in *United States* v. *Mandujano*, 425 U. S. 564, 581 (1976) (plurality opinion), was not joined by a majority of the Court. *Estelle* v. *Smith*, 451 U. S. 454, 469–470 (1981), and *Moore* v. *Illinois*, 434 U. S. 220, 226–227 (1977), merely describe what the *Kirby* plurality had required for the Sixth Amendment to attach, and held that the plurality's test was satisfied. In neither case did the Court have occasion to consider whether the right to counsel could ever attach prior to the point identified by the *Kirby* plurality. As the quotation *supra*, at 193, demonstrates, *Brewer* v. *Williams*, 430 U. S. 387 (1977), left this issue open.

If the authorities take a person into custody in order to interrogate him or to otherwise facilitate the process of making a case against him, then under the rationale of *Escobedo, Miranda,* and our other cases, the person is sufficiently "accused" to be entitled to the protections of the Sixth Amendment. In these circumstances, subjecting the uncounseled suspect to questioning or other prosecutorial techniques may present "the high probability of substantial harm identified as controlling in *Wade,*" *Gerstein,* 420 U. S., at 123. Thus, when a person is deprived of liberty in order to aid the prosecution in its attempt to convict him, and when the deprivation is likely to have the intended effect, that person is, in my judgment, "an accused."

I join the Court's judgment because I agree that respondents' detention in the Administrative Detention Unit (ADU) did not serve an accusatorial function. Under relevant regulations, respondents could be kept in the ADU simply because of the security risk they posed.[4] After hearings,

---

[4] The relevant regulation indicates that respondents could be placed in the ADU while a criminal investigation is pending because they pose a threat to themselves or others:

"The Warden may also place an inmate in administrative detention when the inmate's continued presence in the general population poses a serious threat to life, property, self, staff, or other inmates or to the security or orderly running of the institution and when the inmate:

"(1) Is pending a hearing for a violation of Bureau regulations;

"(2) Is pending an investigation of a violation of Bureau regulations;

"(3) Is pending investigation or trial for a criminal act . . . ." 28 CFR § 541.22(a) (1983).

The Court of Appeals construed the Bureau of Prisons' regulations to permit detention for disciplinary purposes for no more than 90 days. See 704 F. 2d 1116, 1124–1125 (CA9 1983) (en banc). Assuming that construction is correct, the fact that respondents' detention after that point was not disciplinary does not mean it was therefore accusatory. To the contrary, the applicable regulation states: "Administrative detention is to be used only for short periods of time except where an inmate needs long-term protection . . . , or where there are exceptional circumstances, ordinarily tied to *security* or complex investigative concerns." 28 CFR § 541.22(c)(1)

prison administrators had concluded that respondents likely had murdered fellow inmates. Under such circumstances there can be no doubt that concern for the welfare of other inmates or respondents themselves fully justified administrative detention entirely apart from its relation to an ongoing criminal investigation. See *Hewitt* v. *Helms*, 459 U. S. 460, 473–476 (1983). Indeed, there is no finding in either of these consolidated cases that respondents were placed in the ADU at the behest of prosecutorial authorities or in order to aid prosecutorial efforts, nor is there a finding that their detention facilitated the investigation of the two murders at issue.[5] On this record there is no reason to believe that the segregation of suspected murderers from the general prison population either was intended to or had the effect of facilitating a criminal investigation rather than simply serving legitimate institutional policies.

Accordingly, while I find no Sixth Amendment violation in this case, to the extent that the Court purports to formulate a

---

(1983) (emphasis supplied). Thus, the regulation permits continued detention for security reasons alone. Finally, even if respondents' detention was in violation of the regulations, that does not establish that the detention, even if improper, had the purpose or effect of facilitating the criminal investigation.

[5] JUSTICE MARSHALL disagrees with this view of the record, relying on the District Court's statement that respondents Mills and Pierce's confinement to the ADU "was neither a form of prison discipline nor an attempt to ensure prison security," see *post*, at 200 (dissenting opinion). However, the District Court did not denominate this statement as a "finding of fact," but rather as a "conclusion of law." App. to Pet. for Cert. 47a–48a. The only factual predicate to this conclusion, indeed the only fact the District Court found with respect to the purpose and effect of respondents' segregation, was that the Bureau of Prisons' usual policies "would have required the [respondent]s' release back into the general prison population or their transfer to a more secure facility within the first few months after their ADU commitment," *id.*, at 43a. For the reasons stated in n. 4, *supra,* this finding is insufficient as a matter of law to support the Court of Appeals' judgment.

rule broader than necessary to decide the case before it, I cannot join its opinion.

JUSTICE MARSHALL, dissenting.

The majority misreads the development of Sixth Amendment doctrine when it states that "our cases have long recognized that the right to counsel attaches only at or after the initiation of adversary judicial proceedings against the defendant." *Ante*, at 187. As JUSTICE STEVENS demonstrates, *ante*, at 193–197, we have recognized that in certain situations an individual's right to counsel is triggered *before* the formal initiation of adversary judicial proceedings. See, *e. g., Escobedo* v. *Illinois*, 378 U. S. 478, 485–492 (1964). This recognition has stemmed from an appreciation that the government can transform an individual into an "accused" without officially designating him as such through the ritual of arraignment. Moreover, I agree with JUSTICE STEVENS that the government treats an individual as an accused when that individual "is deprived of liberty in order to aid the prosecution in its attempt to convict him, and when the deprivation is likely to have the intended effect . . . ." *Ante*, at 197.

Unlike JUSTICE STEVENS, however, I reject the judgment as well as the reasoning of the Court. JUSTICE STEVENS concurs in the judgment of the Court because, in his view, the transfer of respondents from the general prison population to the far harsher constraints of administrative detention[1] did not in any way serve "an accusatorial function" but served instead to further the security interests of the correctional institution and the welfare of respondents themselves. *Ibid.* My reading of the record and of the factfinding of

---

[1] Subjection to administrative detention meant that respondents were confined in individual cells except for short daily exercise periods, that their participation in various prison programs was curtailed, and that they were denied access to the general prison population. See 704 F. 2d 1116, 1118 (1983).

the courts below leads me to a different conclusion. With respect to respondents Mills and Pierce, the District Court stated, in the portion of its opinion entitled "Factual Background," that by the time they were committed to administrative detention, "the finger of suspicion" had already been pointed at them. App. to Pet. for Cert. 45a–46a. This finding is corroborated by prison officials' own notation that respondents were to be detained in administrative detention "pending investigation or trial for a criminal act," App. 138–139, and by the odd course of events that transpired after respondents' detention: the Government's delay in seeking indictments alongside the unusually long period during which respondents were confined to their cells. See App. to Pet. for Cert. 42a–47a. The District Court was therefore justified in concluding that respondents' "commitment to [administrative detention] was neither a form of prison discipline nor an attempt to ensure prison security," but was instead "part and parcel of a sequence of prosecutive acts integrally related to the application of criminal sanctions." *Id.*, at 47a–48a. The District Court's findings and conclusion were noted and affirmed by the Court of Appeals. 704 F. 2d 1116, 1125 (1983). This Court has repeatedly stated that it "'cannot undertake to review concurrent findings of fact by two courts below in the absence of a very obvious and exceptional showing of error.'" See *Berenyi* v. *District Director, INS*, 385 U. S. 630, 635 (1967), quoting *Graver Mfg. Co.* v. *Linde Co.*, 336 U. S. 271, 275 (1949). In this case no such showing of error has been made.

We do not have the benefit of a trial judge's explicit factual findings with respect to respondents Reynoso, Segura, Ramirez, and Gouveia. However, we do have the Government's admission that one reason all of the respondents were kept in administrative detention was "because of the pendency of the criminal investigation . . . ." Brief for United States 26. This admission further supports the Court of Appeals' conclusion that "each [respondent] was held in

[administrative detention] at least in part as a result of pending criminal charges." 704 F. 2d, at 1125.

Because of their disposition of the Sixth Amendment issue, neither the majority nor JUSTICE STEVENS reaches the other issue posed by this case: whether the Court of Appeals erred by dismissing the indictments against respondents. The Government claims that dismissing the indictments was inconsistent with this Court's decision in *United States* v. *Morrison*, 449 U. S. 361 (1981). In *Morrison*, we reversed the dismissal of an indictment in a case in which it was assumed, *arguendo*, that a Sixth Amendment violation had occurred and in which the defendant "demonstrated no prejudice of any kind . . . to the ability of her counsel to provide adequate representation . . . ." *Id.*, at 366. We stated that, in right-to-counsel cases, dismissal of an indictment is inappropriate "absent demonstrable prejudice, or substantial threat thereof," *id.*, at 365, because a presumption of prejudice would contravene "the general rule that remedies should be tailored to the injury suffered . . . and should not unnecessarily infringe on competing interests." *Id.*, at 364.

The Court of Appeals concluded that dismissal of respondents' indictments was warranted under both the *Morrison* standard and a presumption-of-prejudice standard that it found to be appropriate to the facts of this case. The Court of Appeals felt compelled to articulate an alternative to the *Morrison* standard because, in its view, this case was "fundamentally different" insofar as the right-to-counsel violation affected inmate-suspects held in administrative detention. 704 F. 2d, at 1126. The Court of Appeals concluded that in such a setting a presumption of prejudice would be appropriate "because ordinarily it will be impossible adequately either to prove or refute its existence." *Ibid.* I disagree with the Court of Appeals; its own application of *Morrison* to the facts of this case demonstrates that even in the context of a Sixth Amendment violation affecting prisoners, the usual process of case-specific inquiry will be adequate to determine

whether dismissal of an indictment is warranted. The Court of Appeals concluded that even without an assumption of prejudice "there is evidence that 'substantial prejudice' may have occurred" in this case. 704 F. 2d, at 1126. This conclusion satisfies the *Morrison* requirement that persons seeking dismissal of their indictments must show either "demonstrable prejudice, *or substantial threat thereof . . . .*" 449 U. S., at 365 (emphasis added). Moreover, it is a conclusion amply supported by the record.[2]

Because I agree with the result reached by the Court of Appeals, though not with all of its reasoning, I respectfully dissent.

---

[2] The conclusion that respondents Mills and Pierce were prejudiced is especially reliable due to the District Court's specific finding that "[b]ecause the passage of time has resulted in the irrevocable loss of exculpatory testimony and evidence, the government's failure to take steps to preserve the defendants' right to prepare a defense cannot be remedied other than by dismissing the indictment [with prejudice]." App. to Pet. for Cert. 50a.